IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

MEGAN HOFFMANN KOLB, as
Personal Administrator for the
Estate of DEAN HENRY
HOFFMANN, Deceased,

    Plaintiff,

v.

Case No.

WISCONSIN DEPARTMENT OF
CORRECTIONS; KEVIN A. CARR,
SECRETARY, WISCONSIN DEPARTMENT
OF CORRECTIONS; JARED HOY, DEPUTY
SECRETARY, WISCONSIN DEPARTMENT
OF CORRECTIONS; YANA PUSICH, SECURITY
DIRECTOR; DR. KRISTINA deBLANC,
PSYCHOLOGICAL ASSOCIATE; NATHAN PAC,
CORRECTIONAL OFFICER, and
RANDALL HEPP , WARDEN,
WAUPUN CORRECTIONAL in their individual
and official capacities.

JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES Plaintiff, MEGAN HOFFMANN KOLB, as the Personal Administrator of the Estate of DEAN HENRY HOFFMANN, deceased, by and through her attorney, Lonnie D. Story, of STORY LAW FIRM, LLC, and for her claims against the Defendants, alleges and states as follows:

### INTRODUCTION

1. This is a civil rights action in which Plaintiff, MEGAN HOFFMANN KOLB, as Personal Representative for the Estate of DEAN HENRY HOFFMANN, seeks relief and all damages

1

that flow from Defendants' multiple violations of decedent DEAN HENRY HOFFMANN's rights, privileges and immunities as secured by the Eighth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

2. Mr. Hoffmann (Plaintiff) died on June 29, 2023 as a result of suicide as a result of Defendants' deliberate indifference to Plaintiff's serious mental health needs while he was incarcerated at Waupun Correctional Institution (WCI) located in Waupun, Wisconsin.

3. During the period leading up to June 29, 2023, Defendants owed Mr. Hoffmann a duty to provide adequate medical care.

4. During the same period, Defendants owed Mr. Hoffmann a duty to adequately monitor his mental health status.

5. At all times relevant, Defendants willfully and deliberately ignored their duties, specifically their duties to ensure Mr. Hoffmann had access to mental health medication and treatment.

6. Defendants' willful and deliberate indifference to Mr. Hoffmann's mental health resulted in Mr. Hoffmann's suicide.

7. Hoffmann's pleas for help were met with deliberate indifference and dismissal by correctional and medical staff.

8. On behalf of the estate of Mr. Hoffmann, as the Personal Representative thereof, MEGAN HOFFMANN KOLB seeks all relief appropriate and allowable resulting from the constitutional violations Defendants inflicted upon Mr. Hoffmann.

9. As part of the aforementioned relief, Plaintiff MEGAN HOFFMANN KOLB seeks damages for the Estate, including any and all damages recoverable under all applicable state laws, 42

U.S.C. Sections 1983 and 1988, attorney fees and costs, and any further relief deemed proper by this Honorable Court.

**JURISDICTION AND VENUE**

10. The jurisdiction of the court is invoked pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1983; the Judicial Code, 28 U.S.C. §1331, §1346, and §1391(b); the Constitution of the United States of America; and this Court's supplementary jurisdiction powers pursuant to 28 U.S.C. §1367.

11. Venue is proper in this District under 28 U.S.C.§1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

**PARTIES**

12. Plaintiff MEGAN HOFFMANN KOLB is the duly appointed Personal Representative of DEAN HENRY HOFFMANN as his daughter. MEGAN HOFFMANN KOLB is a resident of COUNTY OF OZAUKEE, STATE OF WISCONSIN.

13. Defendant Wisconsin Department of Corrections ("WDOC") is an entity run by the State of Wisconsin. The Department states it, "works to protect the public through the constructive management of those placed in its charge. We offer education, programming, and treatment to persons in our care that enables them to be successful upon returning to the community. Our mission is to achieve excellence in correctional practices while fostering safety for victims and communities."[1]

---

[1] https://doc.wi.gov/Pages/Home.aspx

14. Defendant Kevin Carr is the Secretary of the WDOC. Defendant Carr is responsible for the management of the WDOC.

15. Defendant Jared Hoy is the Deputy Secretary of the WWDOC and is second in charge of the Department.

16. Defendant Yana Pushich is the Security Director at WCI. Defendant Pusich reviewed Mr. Hoffmann's incident report for an event that took place on or about June 20, 2023.

17. Defendant Dr. Kristina deBlanc is a Psychological Associate at WCI. Dr. deBlanc was responsible for providing mental health services to Mr. Hoffmann prior to his death.

18. Defendant Nathan Pach is a Correctional Officer at WCI. Mr. Pac was involved in the monitoring of Mr. Hoffmann prior to his suicide.

19. Defendant Randall Hepp is the Warden at WCI. As warden at WCI, Defendant Hepp is responsible for all staff and inmates at WCI. Defendant Hepp is responsible for the supervision and training of staff under his management. Defendant Hepp is also responsible for ensuring the health, safety, and well-being of all inmates at WCI.

**FACTUAL ALLEGATIONS**

20. Defendant Wisconsin Department of Corrections ("WDOC") is an entity run by the State of Wisconsin. The Department states it, "works to protect the public through the constructive management of those placed in its charge. We offer education, programming, and treatment to persons in our care that enables them to be successful upon returning to the community. Our mission is to achieve excellence in correctional practices while fostering safety for victims and communities."[2]

---

[2] *Id.*

4

Case 2:24-cv-00160-NJ   Filed 02/06/24   Page 4 of 18   Document 1

21. At all times relevant, Defendant WDOC was responsible for providing medical and mental health services, treatment, and medication to Mr. Hoffmann while in custody.

22. Defendant WDOC was additionally responsible for creating and implementing policies, practices, and protocols that govern the provisions of medical and mental health care to all inmates within WDOC.

23. Dodge Correctional Institution's primary purpose is "to serve as the central reception center for all adult male inmates sentenced to prison." [3]

24. One of the broad responsibilities for Dodge Correctional Institution (DCI) personnel is to "receive and facilitate the assessment of adult male inmates sentenced to prison by the court. This process includes admission, initial record development, medical and mental health screening, and initial classification of inmates." [4]

25. Prior to his death, Mr. Hoffmann had a history mental illness, including, but not limited to, bipolar disorder, schizophrenia, depression, hypothyroidism, diabetes and anti-social personality disorder. In fact, prior to his trial on charges for which he was subsequently convicted and incarcerated for, he had been deemed by mental health professionals and the court as being mentally ill but competent to stand trial, although there was strenuous disagreement.

26. At DCI, Mr. Hoffmann was categorized as MH-2A, the most severe category of mental illness classification.

27. On or about April 10, 2023, Mr. Hoffmann was transferred from DCI to WCI.

---

[3] https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/DodgeCorrectionalInstitution.aspx

[4] *Id.*

28. WCI's Purpose Statement alleges, "The purpose of Waupun Correctional Institution (WCI) is to provide inmates, staff, and the public with a safe and secure institution, *while encouraging positive growth and enabling inmates to successfully re-enter society.*"[5]

29. At all times relevant, Defendant Hepp was responsible for the daily operations of WCI.

30. At all times relevant, and based on information and belief, Defendant Pushich was responsible for security classifications at WCI.

31. When Mr. Hoffmann was transferred from DCI to WCI, approximately thirty (30) days of medication was transferred with him.

32. Mr. Hoffmann arrived at WCI approximately eleven (11) days post-lockdown initiation at WCI.

33. In his individual and official capacity, Defendant Hepp implemented a lockdown at WCI on or about March 29, 2023.

34. According to prison officials, the lockdown was implemented due to, "some of the institution population breaking rules that are in place to assure everyone's safety." [6]

35. Reporting in the Milwaukee Journal Sentinel also stated, "More than half of the staff positions at Waupun are unfilled, while the prison is housing 120 more people that its 882-person capacity." [7]

36. Upon his arrival at WCI, Mr. Hoffmann was never given a psychological exam due to the lockdown restrictions that were in place upon his arrival.

---

[5] https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/WaupunCorrectionalInstitution.aspx

[6] https://www.jsonline.com/story/news/2023/11/02/heres-what-you-need-to-know-about-the-waupun-prison-lockdown/71400906007/

[7] *Id.*

37. When Mr. Hoffmann arrived at WCI, he wrote a request to staff stating he had not been given any of his medication.

38. Based on information and belief, Mr. Hoffmann was not receiving all of his prescribed medications immediately upon his arrival at WCI. Additionally, Mr. Hoffmann was a diabetic and received three cold meals daily.

39. On or about May 5, 2023, Mr. Hoffmann told his family he had only been able to use the phone twice during his, then, twenty-six (26) days at WCI.

40. In one phone call, guards unplugged the phone on Mr. Hoffmann while he was in the middle of a conversation.

41. On or about May 18, 2023, a note in Mr. Hoffmann's file stated he had not been seen by mental health services due to the modified movement at WCI in place at the time.

42. Mr. Hoffmann had consistently and continuously asked for medical treatment and was displaying serious symptoms of mental illness, including but not limited to severe anxiety, paranoia, pressured speech, poor judgment, poor insight, loss of appetite, weight loss and insomnia.

43. Mr. Hoffmann's frustration came to an apparent head on or about June 20, 2023.

44. After taking a shower, Mr. Hoffmann refused to go back into his cell.

45. Correctional Officer Reynolds informed Sergeant Schuett that, "Hoffman [*sic*] said he was being threatened by his cellmate and that he was told he could either claim suicidal or refuse to lock in by his cellmate, and that his cellmate was stealing property from him."

46. In Sergeant Schuett's report he goes on to state, "I called the supervisors office and informed Captain Pawylyk of the situation, and then proceeded to talk with Inmate Hoffman [*sic*]."

47. After Mr. Hoffmann refused to go back into his cell citing "fear of his safety because of threats his cellmate made to him," Mr. Hoffmann was ordered back into his cell by Sergeant Schuett.

48. Mr. Hoffmann again refused, citing concerns for his safety.

49. Instead of WCI staff addressing the threats made to Mr. Hoffmann, or acknowledging his lack of safety returning to his cell, Mr. Hoffmann was handcuffed and escorted to the Restricted Housing Unit.

50. Wis. Stat. §302.40 states, "For violating the rules of the jail, an inmate may be kept in solitary confinement, *under the care and advice of a physician*, but not over 10 days. (Emphasis added.)

51. There is no evidence any required medical and/or mental health paperwork was ever filled out during Mr. Hoffmann's stay in solitary confinement.

52. When DOC Staff make placement into Temporary Lock Up (TLU), Staff "shall complete DOC-67 at the time of placement." DOC 1024, DAI Policy #303.00.03, I.D.[8]

53. The information contained on DOC-67 includes: Reason(s) for placement, *Mental health code*, and other items. *Id.*

54. Based on information and belief, the DOC-67 form was not filled out.

55. Defendants, who should have been aware of Mr. Hoffmann's mental health issues, placed him in solitary confinement for a minor incident despite Mr. Hoffmann expressing concerns for his safety.

56. All TLU placements "shall" be reviewed within two working days. *Id.* at E.1.

---

[8] https://doc.wi.gov/DepartmentPoliciesDAI/3030003.pdf

57. According to subparagraph (1), "The review *shall* include consultation with PSU staff regarding placement and conditions of confinement if the PIOC [Persons in Our Care] has a mental health code of MH-2A, MH-2B, or ID." *Id.* (Emphasis added).

58. Additionally, DOC 1024, DAI Policy #308.00.01, Serious Mental Illness (SMI) is defined as MH-2A or MH-28 mental health codes. [9]

59. Mr. Hoffmann was categorized as MH-2A, the most severe category of mental illness classification during his intake.

60. Based on information and belief, Mr. Hoffmann's TLU report was <u>not</u> reviewed within two business days.

61. While confined in solitary confinement, Mr. Hoffmann began to rapidly deteriorate mentally and physically.

62. On or about June 24, 2023, a nurse observed Mr. Hoffmann in his solitary confinement cell.

63. Only a visual check was done with still no report of a psychological exam being done during Mr. Hoffmann's time at WCI.

64. On or about June 26, 2023, Mr. Hoffmann reportedly requested Depakote after being frustrated with the frequency of the administration of his medicine.

65. Based on Mr. Hoffmann's records obtained from WCI and DOC, Mr. Hoffmann was not administered medications on a consistent basis.

66. Specifically, of the four (4) medications Mr. Hoffmann was to be given daily as ordered by his physician and psychiatrist, for mental illness, diabetes and hypothyroidism, he only

---

[9] https://doc.wi.gov/DepartmentPoliciesDAI/3080001.pdf

received thirty-six (36) days of one, seventeen (17) days of another, and four (4) days of the other two (2) from April 10, 2023 through the date of his death on June 29, 2023.

67. Additionally, some medication distribution was marked as "refused" in a medication log when it may or may not have ever been offered. Also, these were night time medications that were being offered in the morning.

68. According to an inmate near Mr. Hoffmann, Mr. Hoffmann was telling staff, including the psychiatrist for "2-3 days" before his suicide that he was "hearing voices," and, "couldn't sleep." In addition to these statements, Mr. Hoffmann asked staff for his prior mental health medication, Depakote, which was never provided.

69. According to the same inmate, Mr. Hoffmann informed WCI staff that the voices he was hearing told him to kill himself.

70. Based on information and belief, Mr. Hoffmann never received any mental health care despite him displaying behaviors indicative of an individual in a mental health crisis.

71. Defendant Nathan Pach reportedly heard Mr. Hoffmann's complaint and informed him, "he didn't care," or words to that effect, if Mr. Hoffmann were to kill himself.

72. On or about June 27, 2023, one week after Mr. Hoffmann was put in solitary confinement, Defendant Pushich reviewed the incident report from June 20, 2023.

73. Defendant Pushich additionally described the incident on June 20, 2023, as creating "a risk of serious disruption at the facility or community."

74. In the review, Defendant Pushich checked the box of "Psychological services input for serious mentally ill inmate."

10

Case 2:24-cv-00160-NJ   Filed 02/06/24   Page 10 of 18   Document 1

75. There is no record of Mr. Hoffmann receiving any psychological services while in solitary confinement.

76. On or about June 28, 2023, Mr. Hoffmann was served a bag dinner. He ate part of it.

77. On June 29, 2023 at 5:09 a.m., a correctional officer walked by Mr. Hoffmann's cell without actually observing Mr. Hoffmann.

78. On June 29, 2023 at 6:21 a.m., Defendant Pach walked by Mr. Hoffmann's cell without stopping, while passing out morning medication, even though Mr. Hoffmann was supposed to receive his morning medication of Levothyroxine.

79. In addition to paragraph 78 above, video evidence shows when passing the cell at 6:21 am, Defendant Pach failed to open the food trap door to obtain a visual of Mr. Hoffmann while in his cell.

80. At approximately 6:45 am, Mr. Hoffmann was found deceased.

81. The guard that found Mr. Hoffmann failed to wear a body camera during the course of his shift as required by DOC rules and regulations.

82. When Mr. Hoffmann was discovered, guards reported him being cold and pale.

83. Mr. Hoffmann was cut down, put in restraints, and laid down in his cell.

84. Approximately seven (7) minutes after being discovered, guards called 911.

85. Upon arrival of other guards, chest compressions were allegedly started at 6:48 am.

86. Emergency Medical Services (EMS) arrived to Mr. Hoffmann's cell approximately nineteen minutes *after* Mr. Hoffmann was discovered in his cell.

87. Mr. Hoffmann was intimated at approximately 7:14 am.

88. At approximately 7:25 am, EMS called Mr. Hoffmann's time of death.

89. Based upon information and belief, photos from Mr. Hoffmann's cell show the partially eaten bagged dinner previously provided on or about 4:22 pm on June 28th, 2023.

90. The bagged dinner being present shows Mr. Hoffmann's garbage was not picked up anytime between 4:22 pm on June 28, 2023 and the morning of his suicide on June 29, 2023.

91. Mr. Hoffmann was left in his cell until approximately 8:45 am when the Dodge County Medical Examiner arrived at Mr. Hoffmann's cell.

92. Three days <u>after</u> Mr. Hoffmann's passing, Dr. deBlanc writes a report regarding her June 26th interaction with Mr. Hoffmann.

## CLAIMS

### COUNT I - MONELL LIABILITY - DEFENDANTS

93. Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

94. Defendant WDOC is a "person" for the purposes of 42 U.S.C. §1983.

95. All Defendants acted under color of state law, while operating in their respective capacities during their interactions with Mr. Hoffmann.

96. Upon information and belief, between on or about April 10, 2023 and on or about June 29, 2023, Defendants, with deliberate indifference to the rights of Mr. Hoffmann, maintained and permitted a custom, pattern, and/or practice - by and through its agents and employees acting under color of law - ignoring Mr. Hoffmann's mental health needs in violation of Mr. Hoffmann's Constitutional rights.

97. WCI had longstanding, systemic deficiencies in medical and mental health care provided to inmates and, further, Defendants knew of these systemic deficiencies and the substantial risks

posed to inmates like Mr. Hoffmann but failed to take reasonable steps to alleviate those deficiencies and risks.

98. Contrary to Defendants constitutional responsibilities, policy, custom and practice was to refuse to refer inmates to outside medical care and delay necessary treatment to inmates due to a lackadaisical attitude and approach, disinterest, deliberate indifference, understaffing, incompetence and poor training and/or complete lack of training.

99. Even in medical emergencies, where it was obvious prisoners' medical conditions far exceeded the capabilities of staff and facilities available at WCI, Defendants had a policy, custom, and practice of refusing to transfer inmates outside the prison for a higher level of medical care to save expenses, manpower and inconvenience. This policy, practice, and custom originated at the highest level of WCI, including Defendant Warden Hepp downwardly through administration, correctional staff and medical staff.

100. Upon information and belief, Defendants had implemented numerous policies, customs, and practices at WCI which resulted in needless, unwarranted, and preventable suffering, denial of medical care and death. Additionally, written WDOC policies that relate to mental health and medical care were regularly ignored. These policies, customs and practices at WCI include, but are not limited to:

A. Withholding necessary medications, services, and care from inmates to cut costs and/or accommodate staff shortages and reduce basic manpower requirements;

B. Chronic inadequate staffing, insufficient to ensure minimum levels of observation and monitoring of inmates;

C. Even though WCI had a written policy requiring visual supervision of inmates in solitary confinement, assigned correctional officers were often distracted and even sleeping at their posts. On at least two other occasions, another inmate successfully committed suicide and was not discovered until the next shift. Defendants routinely tolerated this behavior by WCI correctional officers; it amounted to an accepted and widespread custom and practice;

D. There was a general lack of empathy and callous mistreatment by WCI correctional officers towards inmates with mental illness, which included mocking them and referring to them by demeaning nicknames;

E. There was a pervasive attitude of indifference by correctional officers and mental health staff toward inmates. Rather than provide necessary mental health care, staff often dismissed problems by saying, "That's just what he does";

F. While WCI had a policy of daily mental health rounds, personnel who were responsible for these rounds would often sign off without actually checking on inmates;

G. Nightshift correctional officers, including supervisors, would regularly ignore the policy of completing a "standing count" by marking it completed without actually performing the "standing count". Defendants routinely tolerated this behavior by correctional officers; it amounted to an accepted and widespread custom and practice;

H. WCI medical staff regularly failed to respond to requests for medical care for days, weeks and even months;

I. Commonplace noncompliance with required state medical and prison standards for care for acute emergencies, including protocols for assessment of inmates;

J. Reliance on low-level providers and hiring and retention of poor quality and inadequately trained staff, who make threshold decisions regarding care or evaluation of inmates with emergent medical injuries;

K. Underutilization of diagnostic techniques and technologies.

101. As a direct and proximate result of such customs, patterns, and/or practices, and the actions of Defendants in their individual and official capacities, Mr. Hoffmann sustained injuries and damages as alleged herein.

## COUNT II - VIOLATION OF THE EIGHTH AMENDMENT

102. Plaintiff realleges the above paragraphs and incorporates same as if more fully set forth herein.

103. The Eighth Amendment's cruel and unusual punishment clause "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).

104. The Eighth Amendment also protects "prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014).

105. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'…prescribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 1204 (1976).

106. To establish an entitlement to damages for deliberate indifference to a serious medical need, an inmate must show evidence that an objectively serious medical condition was presented

15

that a defendant responded to with deliberate indifference, thus resulting in some injury. *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020).

107. "Suicide is an objectively serious medical condition and, as a result, a prison official cannot intentionally disregard a *known* risk that an inmate is suicidal." *Id.* (Emphasis added).

108. At all times relevant, Mr. Hoffmann was entitled to all rights, privileges and immunities afforded to all incarcerated citizens of the State of Wisconsin and the United States.

109. At all times relevant, Defendants were acting within the course and scope of their employment with the Wisconsin Department of Corrections and were acting under color of state law with the authority granted to them as corrections officers, supervisors, shift supervisors, health care providers, wardens, and/or administrators, along with any other roles or responsibilities not mentioned under the supervision of any named Defendant.

110. Pursuant to the Eighth Amendment of the United States Constitution, Mr. Hoffmann had a right to be free from cruel and unusual punishment while incarcerated at WCI and at all times relevant while under the custody and control of the Wisconsin Department of Corrections.

111. At all times relevant, Mr. Hoffmann had a right to adequate and sufficient mental health treatment, to include the use and dispensing of medication, such that his life would be preserved and he, at all times, would be free from needless unjustified and preventable pain, suffering, and deterioration of his mental health.

112. At all times relevant, Defendants, with malice, recklessness, and/or deliberate indifference, kept Mr. Hoffmann in a confined area with no adequate access to mental health services and medication.

113. Defendants denied Mr. Hoffmann the ability to seek adequate mental health treatment and denied him reasonable, routine access to mental health medications.

114. Defendants' deliberate indifference to Mr. Hoffmann's medical needs was in furtherance of, and consistent with: (a) policies, customs, and practices which WDOC and WCI promulgated, created, implemented, or possessed responsibility for the continued operation of; and (b) policies, customs, and practices which WDOC and WCI had responsibility for implementing and which other named Defendants assisted in developing or executing.

115. Mr. Hoffmann was in the care of Defendants for approximately 80 days at WCI. During that period of time, Mr. Hoffmann was left unattended for long periods of time.

116. Based on information and belief, of the approximate 80 days in custody, Mr. Hoffmann *never* received all of his prescribed medications each day at WCI.

117. Based on Defendants' actions, Mr. Hoffmann suffered cruel and unusual punishment by unnecessarily suffering mental health issues that resulted in suicide.

118. Mr. Hoffmann is survived by MEGAN HOFFMANN KOLB, a person eligible to recover damages on Mr. Hoffmann's behalf as their next of kin.

119. By the aforementioned actions and/or omissions, Defendants deprived Mr. Hoffmann of the rights secured by the Eighth Amendment of the United States Constitution.

WHEREFORE, Plaintiff prays for judgment against Defendants for actual and compensatory damages, punitive damages, the costs of this action, reasonable attorney's fees, interest as provided by law, and all other further relief this Honorable Court deems just and proper.

RESPECTFULLY SUBMITTED,

Dated: February 5, 2024

Electronically signed by:

__*Lonnie D. Story*_____
Lonnie D. Story, Esquire
Attorney for Plaintiff
STORY LAW FIRM, LLC
Wis. Bar #1121459
732 N. Halifax Avenue, #301
Daytona Beach, Florida 32118
(386) 492-5540
lstorylaw@gmail.com